UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

RICHARD A. FOX,                           )
                                          )
                    Plaintiff,            )
                                          )
          v.                              )          No. 2:19-cv-00115-JMS-DLP
                                          )
R. BROWN, et al.                          )
                                          )
                    Defendants.           )

**Order Granting Motions for Summary Judgment
and Directing Entry of Final Judgment**

Plaintiff Richard Fox, an inmate of the Indiana Department of Correction ("IDOC"), brings this action pursuant to 42 U.S.C. § 1983 alleging that he received constitutionally inadequate medical care for his serious pain between 2018 and 2019. Mr. Fox asserts that defendant medical providers Samuel Byrd and Amy Wright (the "Medical Defendants") have ignored his complaints of pain and that defendants Richard Brown, Kevin Gilmore, and T. Wellington (the "State Defendants") were aware of these alleged failures and did not intervene. The defendants have moved for summary judgment. Mr. Fox has responded, and the defendants have replied. For the following reasons, the motions for summary judgment are granted.

**I. Summary Judgment Standard**

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of

a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Williams v. Brooks*, 809 F.3d 936, 941-42 (7th Cir. 2016). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page,* 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasilades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Illinois Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014).

## II. Facts

A. *The Parties*

Mr. Fox has been incarcerated at Wabash Valley Correctional Facility ("WVCF") since March 16, 2012. Dkt. 64-15, p. 19 (Deposition of Richard Fox ("Fox Dep.") at p. 19: 21-23).

Samuel Byrd is a physician licensed to practice medicine in the State of Indiana who, at all times relevant to this case, was employed as a physician at WVCF. Dkt. 64-2 ¶¶ 1-2.

Nurse Amy Wright has been the on-site Director of Nursing ("DON") at WVCF since June 4, 2018. Dkt. 64-11 ¶ 1. Nurse Wright did not assess Mr. Fox for his complaints of back pain during the relevant period of time. Dkt. 64-15, p. 84-85 ("Fox Dep." 84:18-85: 4).

Defendant Kevin Gilmore is employed by the IDOC as Deputy Warden of Re-Entry at the WVCF. Dkt. 60-6 ¶ 3. Mr. Gilmore has held this position for approximately 10 years. *Id.* Mr. Gilmore is not trained or licensed as a medical professional. Dkt. 60-6 ¶ 6. He is not authorized to instruct any medical professionals to begin, change or cease a particular treatment. *Id.* ¶ 9. As Deputy Warden of Re-Entry, Mr. Gilmore is often designated by the Warden to review and respond to offender correspondence which includes grievances related to medical concerns. Dkt. 60-5 ¶¶ 5-6; Dkt. 60-6 ¶ 4. Mr. Gilmore bases any response to offender correspondence relating to medical concerns on the information provided to him by medical professionals. Dkt. 60-6 ¶ 5.

Defendant Richard Brown was employed by the Indiana Department of Correction ("IDOC") as Warden at the Wabash Valley Correctional Facility from February 2011 to April 1, 2020. Dkt. 60-5, ¶ 2. Mr. Brown is not trained or licensed as a medical professional nor can he order specific treatment or prescribe medication for an offender. *Id.* ¶¶ 8-10.

Defendant Thomas Wellington was employed by the IDOC as a grievance specialist at the WVCF from approximately February of 2018 to December 2018. Dkt. 60-2, p. 5 (Deposition of Thomas Wellington ("Wellington Dep.") 16:8-25). Mr. Wellington has been working as the Grievance Supervisor and ACA manager from approximately December 2018 to present date. *Id.* Wellington does not have any medical training besides CPR and first aid training. Dkt. 60-2 at 25 (Wellington Dep. 95: 9-20). Mr. Wellington does not have the authority to prescribe medications. *Id.*

B. *Mr. Fox's Medical Care*

1. <u>Mr. Fox's Conditions</u>

Mr. Fox was diagnosed with spondylosis in 2007. *See* dkt. 60-9, p. 28. He has also been diagnosed with sciatica and diabetes mellitus. Dkt. 64-2 ¶ 6.

For most of his time at WVCF, Mr. Fox's medical records listed his spondylosis condition as a "chronic care" condition eligible for treatment at recurring chronic care appointments. Dkt. 60-9, pp. 12, 28, 32, 53, 62, 101, 134, 149; Dkt. 66-1, p. 4, 7-8 (Deposition of Samuel Byrd ("Byrd Dep.") 23:22-25, 41:4-42:5). Chronic care nurses monitor and meet with chronic care patients, including Mr. Fox, pursuant to any order from the doctor or as needed. Dkt. 66-3, p. 6 (Deposition of Amy Wright ("Wright Dep.") 57:2-14). The nurses do not diagnose inmates or prescribe any medication. *Id.*, p. 8 (Wright Dep. 65:10-12).

Sciatica refers to back pain caused by pressure on the sciatic nerve. Dkt. 64-2 ¶ 7. Typically, pain originates in the spine and radiates down one or both legs. *Id.* The first-line treatment for this condition is physical therapy and stretching in an effort to remove pressure from the nerve. *Id.* If the patient is overweight, weight reduction is encouraged to limit the pressure on the nerve. *Id.* If conservative measures are unsuccessful, pain medications may be indicated. *Id.*

Spondylosis is a general term which describes age-related degenerative arthritis of the spine. *Id.* ¶ 8. Spondylosis is synonymous with osteoarthritis. *Id*. Spondylosis can occur at any level of the spine, with lumbar and cervical spondylosis being the most common types. *Id*. Pain can range from nonexistent to severe. *Id*. First-line treatments include medications such as Non-Steroidal Anti-Inflammatories ("NSAIDs") and physical therapy. *Id*. If these measures do not provide relief, corticosteroid injections may be indicated to seek relief. *Id*. In rare instances, surgery may be indicated to relieve pressure on the spine. *Id*. Spondylosis cannot be cured. *Id*.

During the times relevant to Mr. Fox's complaint, he was treated with Neurontin, Keppra, and Trileptal. Neurontin is a highly trafficked and abused medication in the correctional setting. *Id.* ¶ 32. Although the drug's primary use is as an anti-seizure medication, it was for quite some time used to treat nerve pain with some success. *Id.* The drug is preferred by many offenders because there are few side effects and few concerns with taking the medication in combination with other medications and controlled substances. *Id.* However, it is the single most abused drug in the correctional setting. *Id.*

Neurontin, Keppra, and Trileptal all belong to the same class of medications: anti-epileptic drugs. *Id.* ¶ 24. While each medication has slightly different mechanisms of action, the medications all aim at achieving the same result: suppressing the excessive firing of neurons during seizures. *Id.* For each of these three medications, it is vital that a patient stick to the prescribed course of treatment so that the efficacy of the medication may be assessed and, if necessary, the dosage of the medication adjusted. *Id.* For each medication, it is recommended to start the patient on the lowest dosage, then titrate the medication as necessary to achieve the desired result and monitor for adverse side effects. *Id.* For each of these medications it is also important for the patient to take the medications consistently to allow the given medication to build up in the patient's system and allow for the passage of time to review the medication's efficacy. *Id.*

Keppra, Trileptal and Neurontin cause different side effects in patients and affect each patient differently. Dkt. 66-1, p. 9 (Byrd Dep. 47:2-14). Mr. Fox's other chronic conditions, including diabetes, hyperlipidemia and others, would not affect the use of Trileptal, Keppra and Neurontin on Mr. Fox's spondylosis condition and would not have caused Dr. Byrd to have prescribed one over the other. Dkt. 66-1, p. 10 (Byrd Dep. 50:2-13).

Mr. Fox has also had access to a cane and a back brace for the time relevant to his claims. Dkt. 64-15, p. 73, 74 (Fox. Dep. 73:6-20, 74-1-3).

A1c is a test used to gauge the average blood sugar levels of a patient for a span of approximately three months. Dkt. 64-2 ¶ 16. Where an accu check tests the patient's glucose level at any one point in time, the A1c expands the timeline to show the trend of a given patient's glucose level for approximately 90 days. *Id.* This allows practitioners to gain insight into how to properly address each patient in an attempt to control glucose levels to prevent comorbid conditions associated with diabetes. *Id.* An ideal range for A1c is below 6.0%. *Id.* ¶ 17. Patients who have an A1c of 6.5% or above are diabetic. *Id.* Generally speaking, the lower a diabetic's A1c the better the prognosis is for the patient. *Id.* Neuropathy is a common comorbid condition in patients diagnosed with diabetes, especially when the patient does not maintain ideal glucose levels. *Id.* Studies have found that lowering a patient's A1c by 1% reduces the risks of retinopathy, neuropathy, and kidney disease by 25%. *Id.* A patient can safely and quickly reduce his/her A1c, by increasing exercise, losing weight, following the recommended treatment plan, eating a healthy diet, and routinely checking his or her blood glucose so that high blood sugar levels may be corrected through additional insulin. *Id.* ¶ 18.

### 2. Requesting Health Care in Prison

If an inmate needs to schedule a visit with the doctor, he must complete a Request for Health Care Form ("RFHC") and submit it to a box located in each housing unit. Dkt. 66-3, p. 7 (Wright Dep. 58:11-18). The nurses triage the RFHCs that are submitted according to the type of medical attention that the inmate needs. *Id.*, p. 7 (Wright Dep. 58:19-25). The nurses determine whether to schedule an appointment for the inmate to meet with the doctor. *Id.*, pp. 6, 7 (Wright Dep. 57:20-25, 58:11-22, 61:9-21).

6

3. <u>Mr. Fox's Care in 2017</u>

Throughout 2017, Dr. Byrd prescribed, and Mr. Fox was given, three doses of Neurontin a day to treat the pain arising from his spondylosis. Dkt. 66-1 at 10, 12 (Byrd Dep. 50:14-24, 66:20-67:2, 67:18-25); Dkt. 66-2 p. 2-3; Dkt. 66-5 at 2, 7, 10, 11, 18, 19, 21, 22, 26, 28, 31, 33, 37, 41.

Mr. Fox was assessed and treated by Dr. Byrd on May 24, 2017. Dkt. 64-2 ¶ 23; dkt. 64-10. Dr. Byrd noted that Mr. Fox's A1c was 11.9% and his lowest reported glucose reading was 292 mg/dL in the past month. Dkt. 64-10. During this visit, Mr. Fox also complained of back pain. *Id.* Dr. Byrd discussed with Mr. Fox reports from nursing staff that he was seen diverting his Neurontin order to another offender. *Id.* Dr. Byrd noted that there were no new complaints of weakness and no new neurologic findings. *Id.* Dr. Byrd counselled Mr. Fox that his pain was likely due to his deconditioning, weight gain, and poorly controlled diabetes mellitus. *Id.* Dr. Byrd informed Mr. Fox that an improved A1c would likely improve his pain. *Id.* Dr. Byrd noted that Mr. Fox was disinterested in this advice, leaving the visit before Dr. Byrd could conduct a physical examination. *Id.*; dkt. 64-2 ¶ 23.

Mr. Fox's A1c registered at 14.5% in August 2017, and he was counseled to be compliant with medication, to lose weight, and to eat a healthy diet. Dkt. 64-2 ¶ 19. An A1c at this level would exacerbate Mr. Fox's neuropathy by causing further damage to the nerves in his feet, legs, and back. *Id.* When Dr. Byrd saw Mr. Fox for his next diabetic visit, he appeared to be more compliant with accu checks, but had gained weight. *Id.*

Mr. Fox refused to attend his monthly diabetic visit on December 15, 2017. Dkt. 66-4 Affidavit of Jackie West-Denning MD ("West-Denning Aff.") at 6 ¶ 7.

Mr. Fox was treated by NP Pamela Johnson on September 28, 2017. Dkt. 64-2 ¶ 9; dkt. 64-3. NP Johnson noted that Mr. Fox's most recent A1c was 14.5% and, in response, increased his insulin regimen to gain control of his blood sugar. Dkt. 64-2 ¶ 9; dkt. 64-3.

Mr. Fox was generally noncompliant with accu check and insulin prescriptions throughout 2017. Dkt. 66-5 at 4, 5, 14-17, 24, 25, 29, 32, 36, 29, and 42.

On November 8, 2017, Dr. Byrd prescribed a 90-day refill of Mr. Fox's Neurontin prescription, opining:

> Pt with chronic sciatica related to degenerative changes of Lumbar spine and spondylolisthesis that has been well document in both the Federal and State prison systems. This is relatively stable with Neurontin making pain manageable. He ambulates with a compensated gait using a cane. Neurontin levels most recently 7.4 mcg/mL and 5.8 mcg/mL. He is wearing a lumbar brace for additional support with some improvement in pain when ambulating, but he does little of this due to pain. ROM moderately decreased with moderate pain on ROM as well. I will simply request renewal.

Dkt. 66-6 at 2-3.

Dr. Byrd treated Mr. Fox for his chronic care conditions, including diabetes, on November 30, 2017. Dkt. 64-2 ¶ 10; dkt. 64-4. Dr. Byrd noted that Mr. Fox had a comorbid condition of neuropathy and had gained weight. Dkt. 64-2 ¶ 10; dkt. 64-4. Dr. Byrd further noted that this condition was being managed with diet, oral medication, insulin, and fingerstick accu check glucose monitoring. Dkt. 64-2 ¶ 10; dkt. 64-4. During this visit, Dr. Byrd discussed the importance of Mr. Fox exercising, improving his diet, and being compliant with his medication. Dkt. 64-2 ¶ 10; dkt. 64-4. At the time of this visit, Mr. Fox had an order for 14 units of Humulin N at lunch and 12 units at dinner. Dkt. 64-2 ¶ 10; dkt. 64-4. This order was continued through February 28, 2018 as a result of this visit. Dkt. 64-2 ¶ 10; dkt. 64-4.

8

Mr. Fox was placed in administrative segregation in late 2017. Dkt. 64-15, p. 21-22 (Fox Dep. 21:19-22:2). Another Wexford-contracted doctor, Dr. West-Denning, handled all offenders in Mr. Fox's new housing unit at that time. Dkt. 66-1 p. 14 (Byrd Dep. 74:23-75:12).

Dr. West-Denning was first scheduled to see Mr. Fox on December 15, 2017 for his monthly diabetes visit, but Mr. Fox refused to attend the visit. Dkt. 66-4 p. 6, (West-Denning Aff.) ¶ 7.

### 4. Mr. Fox's Care in 2018

Mr. Fox first saw Dr. West-Denning on January 22, 2018 for a chronic care visit.[1] *Id.* ¶ 8. During this visit, Dr. West-Denning conducted an examination tailored to Mr. Fox's diabetes, noting that Mr. Fox demonstrated good glucose control on the accu check visits which he did not refuse. *Id.* Dr. West-Denning counseled Mr. Fox to go to his accu checks so that medical staff could monitor his glucose levels and adjust his insulin as necessary. *Id.*

In Dr. West-Denning's write-up from that appointment, she does not list any discussion regarding the spondylosis or treatment of spondylosis in her notes and did not refill his prescription or prescribe any other medication for his pain. Dkt. 66-4 p. 16-19.

Mr. Fox's Neurontin prescription ran out on February 5, 2018. *Id.*, p. 19. As a result, he submitted both an RFHC and a grievance on February 6, 2018. Dkt. 66-7, p. 2; dkt. 60-3, p. 11. In response to the RFHC, Mr. Fox was scheduled to be seen by Dr. West-Denning on February 12, 2018. Dkt. 66-4, p. 6 (West-Denning Aff. ¶ 9); dkt. 66-7, p. 2; dkt. 66-4, p. 20-22. That appointment ended prematurely, with Dr. West-Denning claiming that Mr. Fox became aggressive. Dkt. 66-4, p. 6 (West Denning Aff. ¶ 9). Dr. West-Denning did not assess Mr. Fox's spondylosis and therefore

---

[1] The care Dr. West-Denning provided to Mr. Fox is the subject of a separate lawsuit in this court. *See Fox v. West-Denning*, 2:18-cv-237-JPH-MJD.

did not prescribe any medication for Mr. Fox's pain arising from spondylosis. Dkt. 66-4, p. 20-22; dkt. 66-4, p. 7 (West-Denning Aff. ¶ 11).

Mr. Fox submitted three more RFHCs between February 12, 2018 and February 28, 2018, complaining of pain and requesting to speak with a doctor about a potential prescription to treat the pain arising from his spondylosis. Dkt. 66-8, p. 2; dkt. 66-4, p. 23, 24.

Mr. Fox was seen in nursing sick call on both February 23, 2018 and March 6, 2018. Dkt. 66-4, p. 8 (West-Denning Aff. ¶¶ 14, 15). On March 6, 2018, Nurse Loveall assessed Mr. Fox, instructed him again to complete his home exercise plan, and contacted Dr. West-Denning regarding pain management options for Mr. Fox's back pain. Dkt. 66-4, p.  8 (West-Denning Aff. ¶ 15-16). Although Dr. West-Denning prefers to discuss the risks and benefits of a medication prior to prescribing it to a patient, Dr. West-Denning states that she did not have this opportunity on February 12, 2018 due to Mr. Fox's conduct. *Id.* ¶ 17.

In addition to the RFHCs, Mr. Fox submitted informal grievances on February 20, 2018 and February 23, 2018 complaining that he was being denied access to healthcare. Dkt. 60-3, p. 6-7. His informal grievances were denied. *Id.*

Dr. West-Denning next saw Mr. Fox for complaints of musculoskeletal pain on April 16, 2018. Dkt. 66-4, p. 9 (West-Denning Aff. ¶ 18). During this visit, Dr. West-Denning was able to conduct a full physical assessment. *Id.* Dr. West-Denning's notes from the April 16, 2018 appointment state:

> Offender wants to discuss another health care issue that is not scheduled for this visit as this is a chronic care visit. There seems to be nothing urgent or emergent. Departmental policy regarding appropriate avenues for HCR reviewed and offender encouraged to put in appropriate HCRF to be seen for his issue:
>
> Mr. Fox states he has back pain which radiates down his LLE. He has normal sensation when tested with cotton tip and metal in BLE. His DN4 score of 2 and

> LANSS score of 0 indicate that neuropathy are not significantly contributing to his pain.
>
> Offered Mr. Fox anti-depressants, AED, or anti-inflammatory medications. Mr. Fox stated he was interested in only AED today. Started one of these for him on a low dose, after discussion of risks/benefits. Questions answered. Pt voiced understanding.

Dkt. 60-9 p. 136. Dr. West-Denning testifies that she offered him a variety of pain management medications and that he agreed to a trial of Keppra. Dkt. 66-4, p. 9 (West-Denning Aff. ¶ 19). Mr. Fox began taking Keppra the morning of April 19, 2018. Dkt. 64-6 p. 9.

Mr. Fox first refused Keppra on the morning of May 8, 2018. Dkt. 64-6 p. 4. He missed it again on May 21, 2018. *Id.* Mr. Fox testifies that the Keppra did not help his pain. Dkt. 64-15, p. 41 (Fox Dep. 41:1-4). He also states that he experienced side effects from the Keppra, including drowsiness, dizziness, mood swings, constipation, diarrhea, dry mouth, and lightheadedness. *Id.*, p. 11-12 (Fox Dep. 41:5-42:4). Mr. Fox refused Keppra three more times between May 26, 2018 and May 31, 2018 and then began to consistently refuse Keppra in June of 2018. Dkt. 64-6, p. 4, 1. Mr. Fox submitted a RFHC on May 31, 2018, complaining that the Keppra did not work and that the side effects were bad and asking to see a doctor. Dkt. 66-9. Further, Mr. Fox admitted during his deposition that he "[a]bsolutely" missed doses of Keppra, stating: "I can't even remember it is was twice a day, but at that time that you speaking about that with - - with Ms. - - Ms. West-Denning, I was still in the confinement secure unit, so meds came to my door." Dkt. 64-15, p. 39-40 (Fox Dep. 39:23-25, 40:1-9). Mr. Fox testified that he took Keppra "for three-and-a-half maybe four weeks." *Id.* (Fox Dep. at 40:23-24).

Mr. Fox was seen in nursing sick call on June 5, 2018. Dkt. 66-4, p. 11 (West-Denning Aff. ¶ 23). He stated that he did not believe Keppra was effective in treating his pain. *Id.* Accordingly, Mr. Fox was referred to see Dr. West-Denning. *Id.*

Mr. Fox was scheduled with and saw Dr. West-Denning on June 11, 2018. Dkt. 66-4, p. 11-12 (West-Denning Aff. ¶ 24); dkt. 66-4, p. 25-29. At this visit, Mr. Fox complained of lower back pain that radiated to his lower left extremity, left foot, and left buttock. *Id.* Dr. West-Denning discussed various pain management medication options with Mr. Fox, and Mr. Fox was agreeable to a trial of Trileptal, another anti-epileptic drug, after a discussion of its risks and benefits. *Id.* ¶¶ 26-27; dkt. 64-15, p. 44 (Fox Dep. 44:5-25).

Mr. Fox began taking two doses of Trileptal a day on June 13, 2018, the first day it was available to him. Dkt. 64-6, p. 2. Mr. Fox testifies that the Trileptal caused tiredness, sleepiness, dizziness, and loss of balance. Dkt. 64-15, p. 46 (Fox. Dep. at 46:3-5). It also did not ease his pain. *Id.* Mr. Fox did not take the morning doses of Trileptal on June 19, 2018, June 23, 2018, June 26, 2018 and June 28, 2018. Dkt. 64-6, p. 2, 42. On June 28, 2018, Dr. Byrd discontinued the prescription because Mr. Fox was not taking it regularly. Dkt. 64-2 ¶ 13. Dr. Byrd reinstated Mr. Fox's Trileptal order of two doses a day in July of 2018, and Mr. Fox received his first dose at 10:00 p.m. on July 10, 2018. Dkt. 64-6, p. 44

On July 10, 2018, Mr. Fox submitted a RFHC asking to see a doctor because he was in serious pain and his medication was not working. Dkt. 66-10. On July 12, 2018, a nurse responded: "Continue medication", "accu [] insulin x 4 weeks", and "update MD." *Id.* On July 26, 2018, Mr. Fox filed a grievance stating that he has been taking Trileptal for two and a half weeks and it did not relieve his pain. Dkt. 60-3, p. 48.

On July 12, 2018, Nurse Loveall conducted a nursing assessment of Mr. Fox's back, noting that it was not tender, and had intact sensation. Dkt. 64-2 ¶ 14; dkt. 64-7. Nurse Loveall further noted that Mr. Fox had normal range of motion. *Id.* Nurse Loveall contacted Dr. Byrd and communicated her findings. *Id.* Dr. Byrd had Nurse Loveall instruct Mr. Fox to become compliant

12

with his medications, accu checks, and insulin. *Id.* On July 26, 2018, Nurse Wright responded to Mr. Fox's July 10, 2018, grievance, stating: "On 7/12/18 seen by nurse who spoke with Dr. Byrd, she advised to be compliant with meds, accu checks and insulin to help with pain." Dkt. 60-3, p. 48.

Mr. Fox took every dose of Trileptal for three weeks – from 10:00 p.m. on July 10, 2018 until the morning dose on August 2, 2018. Dkt. 64-6, p. 44, 34. Thereafter, Mr. Fox refused or missed doses on the morning of August 6, 2018, the morning of August 11, 2018, the morning and evening of August 19, 2018, the morning of August 22, 2018, the morning of August 26, 2018, the morning of September 3, 2018, the morning of September 11, 2018, the evening of September 12, 2018, and the morning of September 16, 2018. Dkt. 64-6, p. 34, 26. Mr. Fox testified that his symptoms are typically worse in the morning in that he experiences "[e]arly morning stiffness [and] muscle spasms." Dkt. 64-15, p. 129 (Fox Dep. 138:19-139:1). Mr. Fox testified that he usually has to "sit on the side of the bed" and "warm up [his] joints before [he] just get[s] on up." *Id.* (Fox Dep. 139:1-139:10). At times, Mr. Fox would "place a pillow with a blanket wrapped up in between both legs and lay on [his] side at least for . . . two or three hours to try to allow . . . [his] spin[e] to line up." *Id.* (Fox Dep. 139:25-140:11). Mr. Fox indicated that because of these symptoms, he "quit getting" the medicines in the morning. *Id.* (Fox Dep. 139:11-22).

On August 16, 2018, Teresa Littlejohn contacted Nurse Wright regarding an informal grievance Mr. Fox had submitted. Dkt. 64-11 ¶ 4. Nurse Wright reviewed Mr. Fox's medical records and noted that on July 11, 2018, Dr. Byrd had advised Mr. Fox to be compliant with his medical orders for four weeks. *Id.* Ms. Littlejohn responded to Mr. Fox's grievance that if he had been compliant with the medical orders in place for four weeks, he needed to submit another RFHC. Dkt. 64-12.

On August 18, 2018, Mr. Fox submitted an RFHC indicating that Trileptal was not relieving his "serious daily pain" despite following Dr. Byrd's instructions by taking Trileptal for four to six weeks. Dkt. 66-11, p. 2. He asked to see a doctor. *Id.* Mr. Fox was seen and assessed by Nurse Huff in Nursing Sick Call on August 22, 2018. Dkt. 64-2 ¶ 20; dkt. 64-8. He complained that Trileptal was ineffective to address his back pain. *Id.* Nurse Huff conducted a nursing assessment of Mr. Fox's back, noting that Mr. Fox complained of pain with movement but had normal range of motion in his back. *Id.* Nurse Huff charted that she both notified Dr. Byrd of Mr. Fox's complaints of pain and referred Mr. Fox to be seen by a provider. *Id.*

On September 9, 2018, Mr. Fox submitted another RFHC asking to see a doctor because of his chronic back condition and indicating that the medication was not helping. Dkt. 66-12, p. 2. A nurse responded: "Dr. Byrd notified of current pain[,] med not helping[,] however you refused or did not take med numerous times since it was ordered. Please take med regularly to note effectiveness." *Id.*

On September 14, 2018, Mr. Fox submitted a four-page informal grievance indicating, among other things, that he has "personally and repeatedly" requested to stop the Trileptal because it was not helping relieve his "chronic spondylosis, sciatica pains" and that he had taken the medication for over four to six weeks. Dkt. 64-14. He indicated that he believed his condition had gotten worse and wanted to see a doctor. *Id.* Mr. Wellington forwarded this grievance to Nurse Wright on September 18, 2018. Dkt. 60-2, p. 25 (Wellington Dep. 93:13-94:4); Dkt. 60-3, p. 63.

As a result of that grievance, Nurse Wright requested that Dr. Byrd see Mr. Fox. Dkt. 60-3, p. 63. Dr. Byrd saw Mr. Fox on September 19, 2018. Dkt. 66-2, p. 14-17. Dr. Byrd states that he attempted to provide a holistic approach to treating Mr. Fox's conditions, encouraging

compliance with medication, accu checks, and insulin. Dkt. 64-2, ¶ 25. Dr. Byrd's notes from the

September 19, 2018, appointment state:

> Pt was seen today at the request of our DON, Amy Wright, RN. Mr. Fox has apparently filed a grievance over his Neurontin being discontinued and continual pain since that time. He believes not only Dr. Denning, but I am complicit in making him suffer unnecessarily. He has a long-standing h/o sciatica related to spondylosis of his lumbar spine as well as neuropathy of his left upper extremity related to being bit by a K9 at time of his arrest. He reports he was doing fine and was not playing games with his medications as Neurontin levels have always been in a range consistent with compliance. The only level not consistent with compliance was related to him being out of his medication all together, and I have previously verified this with review of the MARs. I advised him I clearly have not been trying to deny him medications since I have been providing care for him. I advised him that a large theft of Neurontin at another facility has led to the IDOC requesting Wexford limit Neurontin as much as possible. It is the most diverted medication in corrections at this time. It has essentially been removed from use in states such as Missouri and Florida. I advised him that Dr. Denning did not simply stop Neurontin out of spite, but she simply wanted him to try formulary options. He notes no improvement at all with Trileptal. He has been on 150mg bid for some time now. Review of MAR shows he would miss dosages sporadically. This would certainly interfere with Trileptal's ability to be efficacious. He notes being tired all of the time since starting the medication. I encouraged him to take it routinely to adjust to the medication. We discussed an increase in Trileptal as well as Cymbalta. He was willing to try both as he states he will do anything I can come up with to decrease his pain level.

*Id.*, p. 14. Dr. Byrd doubled Mr. Fox's dosage of Trileptal and prescribed Cymbalta[2]. Dkt. 66-1 at

16-17 (Byrd Dep. 85:20-86:7). Mr. Fox acknowledged that "the Cymbalta and the Trileptal is

supposed to combine and they both used for pain . . ." Dkt. 64-15, p. 50 (Fox Dep. 50:14-16.)

---

[2] Cymbalta is an antidepressant which has been shown to be effective in managing nerve pain when prescribed in low doses. Dkt. 64-2 ¶ 22. 20-60 mg would qualify as a low dose of Cymbalta. *Id.* Typically, a patient reporting neuropathic-type pain is started at the lowest recommended dosage in order to assess the presence of side effects. *Id.* If no contraindications present in the patient, the dosage is then titrated until the desired result is achieved or the patient arrives at the maximum daily recommended dosage. *Id.* While effective for treating nerve pain, Cymbalta takes time to build up in a patient's system. *Id.* This process can take up to 6 weeks. *Id.* Therefore, when a patient is first provided with a Cymbalta order, he or she is encouraged to allow time to pass so that the medication to build up in their system. *Id.* After allowing for sufficient time to pass, the efficacy of the medication for the patient's complained-of pain can be assessed. *Id.*

C. *Mr. Fox's Grievances and Correspondence to the Warden*

Mr. Fox submitted several grievances regarding his medical care during the relevant time. If an inmate submits an informal grievance related to his medical condition, the grievance specialist forwards those to the Director of Nursing, who then reviews and responds to them. Dkt. 66-3, p. 5 (Wright Dep. 51:2-25). If an inmate submits a formal grievance, the grievance specialist responds to it. *Id.* 66-3, p. 4 (Wright Dep. 46:1-9).

As discussed above, Mr. Fox filed an RFHC and a grievance on February 6, 2018, when his Neurontin prescription ran out. 66-7, p. 2; Filing No. 60-3, p. at 11. Mr. Wellington rejected the grievance because there was no indication that Mr. Fox had tried to resolve the complaint informally and because it seemed to be submitted on behalf on another person or group. *Id.*, p. 10.

Mr. Fox submitted informal grievances on February 20, 2018 and February 23, 2018 complaining that he was being denied access to healthcare. Dkt. 60-3, p. 6-7. The response to his February 20, 2018, grievance stated: "Seen by MD on 2/12/18. MD attempted to address your complaint of back pain but you became agitated, called her a 'bitch' and left before you could be assessed. No new orders for Neurontin will be addressed until you are seen by MD." *Id.* The response to the February 23, 2018, informal grievance appears to have referred Mr. Fox to the response to the February 20, 2018, informal grievance. *Id.* p. 7 ("see attached grievance answered regarding above complaint").

On March 8, 2018, Mr. Fox filed a formal grievance relating to his prescribed pain medication and the "need to be seen on this matter [] immediately." Dkt. 60-3, p. 5. This formal grievance was logged as # 101220. Dkt. 60-3, p. 4. Mr. Wellington referred the matter to Health Services Administrator ("HSA") Hobson for a formal statement on March 12, 2018. *Id.*, p. 12. HSA Hobson responded to Mr. Wellington in writing on March 14, 2018. Her response stated:

MD charts you are non-compliant with the exercises that were recommended. You terminated your last visit and the provider will not renew pain medication without a complete assessment. If you have a medical condition you wish to be seen for submit a HCRF and you will be rescheduled for nursing sick call.

*Id.* p. 13-14. Based on this statement, Mr. Fox's grievance was denied. *Id.* p. 19; dkt. 60-2, p. 17 (Wellington Dep. at p. 63:24-64:5).

On March 20, 2018, Mr. Fox sent a six-page letter to Warden Brown's Office. Dkt. 60-7. In this letter, Mr. Fox raises several issues: that he had not received any responses to the grievances that he and believed he was being treated unfairly; he was experiencing pain because of his medical condition; he had discussed his pain level and serious symptoms with Dr. West-Denning; he believed Dr. West-Denning was punishing him by refusing to reorder his pain medication; and he was personally requesting that Warden Brown address his concerns. *Id.*

On March 29, 2018, Mr. Gilmore provided a written response to Mr. Fox's letter stating that that Mr. Fox terminated his visit with Dr. Denning on February 12, 2018, before he could be assessed, and that Mr. Fox was prescribed Naproxen. *Id.*, p. 6. Mr. Gilmore directed Mr. Fox to submit an RFHC if he would like to be seen before his upcoming Chronic Care Visit. *Id.*

Mr. Fox submitted an informal grievance on July 10, 2018, complaining of pain. Dkt. 60-3, p. 48. The response stated "On 7/12/18 seen by Nurse who spoke with Dr. Byrd, he advised to be compliant with meds, accu checks and insulin to help with pain." *Id.*

On August 6, 2018, Mr. Fox submitted a formal grievance relating to his medical care. Dkt. 60-3 p. 52. Mr. Wellington returned the grievance on August 8, 2018 because Mr. Fox did not complete the relief requested portion of the form. *Id.*, p. 51. Mr. Fox then re-submitted his grievance with the relief portion completed. *Id.*, p. 50. On August 13, 2018, Mr. Wellington returned the grievance because he found that the complaint or concern was addressed previously in Grievance # 101220. *Id.* p. 54.

On August 14, 2018, Mr. Fox sent a letter to the Warden's Office complaining about his grievances being returned. Dkt. 60-8. Specifically, Mr. Fox explained that Mr. Wellington had wrongfully rejected his grievance based on the conclusion that his complaint had previously been addressed. Dkt. 60-8. In August or September 2018, Mr. Fox ran into Mr. Gilmore, identified himself, and notified him that he submitted a letter. Mr. Gilmore responded that if he had the letter on his desk or in his mailbox, he would respond to it. Dkt. 64-15, pp. 120, 122 (Fox Dep. 120:120:5-24, 122:10-21).

Teresa Littlejohn responded to Mr. Fox's letter[3] on August 16, 2018. Dkt. 60-3 at 55. That letter stated:

> I reviewed grievance 101220. The incident date noted was 2/12/18. Your complaint was that your pain medication was not renewed.
>
> The Returned Grievance dated 8/13/18 stated, "The issue in this complaint or concern was addressed previously in Grievance #101220." Grievance Specialist Wellington and I reviewed the return and the letter you submitted asking for reconsideration. I do not believe the complaints are the same.
>
> What I would advise is that you do as Medical has instructed and submit a Request for Health Care stating that Dr. Byrd said for you to be [compliant] for 4 weeks and you have done so without relief, provided that is the case. Then if Medical refuses to change your medication you can use that paperwork as your informal to file a grievance.

Dkt. 60-3, p. 55.

On September 14, 2018, Mr. Fox submitted a four-page informal grievance. Dkt. 64-14. Mr. Wellington forwarded the grievance to Nurse Wright on September 18, 2018. Dkt. 60-3, p. 63. Nurse Wright responded to Mr. Wellington's email on the same day, noting that Mr. Fox would be scheduled to be seen by Dr. Byrd regarding his pain medication. Dkt. 60-3, p. 63.

---

[3] While it is not clear, it appears from the record that this is the letter that Mr. Fox referred to when he approached Mr. Gilmore.

### III. Discussion

The defendants argue that they were not deliberately indifferent to Mr. Fox's serious medical needs. Mr. Fox's claims against the Medical Defendants and the State Defendants will be addressed separately.

A. *Medical Defendants*

To prevail on his Eighth Amendment claim deliberate indifference against the Medical Defendants, Mr. Fox must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendants knew about his condition and the substantial risk of harm it posed, but disregarded that risk. *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc). "[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, "the defendant must have known that the plaintiff 'was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so.'" *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (*quoting Armstrong v. Squadrito*, 152 F.3d 564, 577 (7th Cir. 1998)). Whether a doctor is deliberately indifferent depends on the totality of care the doctor provided. *Petties*, 836 F.3d at 728. Further, "[t]o infer deliberate indifference on the basis of a physician's treatment decision, the decision must be so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006); *see also Plummer v. Wexford Health Sources, Inc.*, 609 Fed. Appx. 861, 2015 WL 4461297, *2 (7th Cir. 2015) (holding that defendant doctors were not deliberately indifferent because there was "no evidence suggesting that the defendants failed to exercise medical judgment or responded inappropriately to [the plaintiff's] ailments"). In addition, the Seventh Circuit has explained that "[a] medical professional is entitled to deference in treatment decisions unless no minimally

19

competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

The Medical Defendants agree for purposes of summary judgment that Mr. Fox's pain caused by spondylosis and sciatica are objectively serious medical needs. They argue, however, that they were not deliberately indifferent to his need for treatment.

### 1. Dr. Byrd

Dr. Byrd argues that he was not deliberately indifferent to Mr. Fox's back pain. He contends that the totality of the care he provided to Mr. Fox was appropriate and that he exercised his medical judgment in treating him. Mr. Fox responds that he took the medications prescribed to him even though they caused side effects and were ineffective. Mr. Fox also argues that his compliance or non-compliance with the prescribed treatments, and the effect on his pain, are disputed issues of fact for trial.

Here, the record viewed in the light most favorable to Mr. Fox reveals that Dr. Byrd regularly treated Mr. Fox's pain. Mr. Fox was provided insulin and accu checks to treat his diabetes, which can contribute to neuropathy. He was also advised to lose weight and exercise and had a back brace and a cane to help his pain. Dr. Byrd prescribed Neurontin for Mr. Fox's pain throughout 2017 and into 2018, when his prescription expired on February 5, 2018. Dkt. 66-4. Then, on April 16, 2018, Dr. West-Denning prescribed Mr. Fox Keppra for his pain. Dkt. 66-4, p. 9 (West-Denning Aff. ¶ 19). When the Keppra did not help, on June 11, 2018, Mr. Fox agreed to try Trileptal for his pain. He experienced side effects from the Trileptal including tiredness, sleepiness, dizziness, and loss of balance. Dkt. 64-15, p. 46 (Fox. Dep. 46:3-5). Mr. Fox missed

20

his morning doses of Trileptal four times near the end of June and Dr. Byrd discontinued the prescription, but reinstated it on July 10, 2018. Dkt. 64-6 at 44. After Mr. Fox had submitted an RFHC on July 10, 2018, asking to see the doctor because he was in pain and the medication was not working, he saw Nurse Loveall in Nursing Sick call on July 12, 2018, who noted: "Spoke with Dr. Byrd, states offender needs to be compliant with current medication orders and accu checks and insulin x 4 weeks." Dkt. 64-7 p. 3. At that time, Mr. Fox had missed several doses of Trileptal in June and had only restarted it on July 10.

Mr. Fox then refused or missed five doses of Trileptal in August and four in September. Dkt. 64-6 at 34, 26. Mr. Fox states that because the pain was worse in the morning, causing stiffness and muscle spasms, he "quit getting" the medicines in the morning. Filing No. 64-15, p.  139 (Fox Dep. 139:11-22). Mr. Fox filed an RFHC on August 18, 2018, stating the Trileptal was not relieving his "serious daily pain" despite following Dr. Byrd's instructions by taking Trileptal for four to six weeks. Dkt. 66-11 at 2. On August 22, 2018, a nurse responded: "Trileptal not effective[.] Will discuss with MD." *Id.* There is no evidence regarding which doctor the nurse spoke to or what that doctor advised.  On September 9, 2018, Mr. Fox submitted another RFHC asking to see a doctor for his pain. Dkt 66-12. A nurse responded: "Dr. Byrd notified of current pain[,] med not helping[,] however you refused or did not take med numerous times since it was ordered. Please take med regularly to note effectiveness." *Id*. Mr. Fox next saw Dr. Byrd on September 19, 2018, at which time Dr. Byrd increased his Trileptal and prescribed Cymbalta.

In other words, when Dr. Byrd saw Mr. Fox for his complaints of pain, he prescribed medications for it. While Mr. Fox suggests that Dr. Byrd was aware that Mr. Fox was in pain for much of 2018 and refused to address his pain, it is undisputed that Mr. Fox was under Dr. West-Denning's care during the first half of 2018. There is no evidence to support a conclusion that

Dr. Byrd, despite the fact that he was not treating Mr. Fox at that time should have known about Mr. Fox's care or should have concluded it was inadequate. After that, when Mr. Fox was inconsistent with taking his pain medication, he advised him to be consistent in taking it. The evidence reflects that Dr. Byrd's advice for Mr. Fox to take his medication consistently for a few weeks to be sure of its efficacy was based on his medical judgment that consistent dosages were necessary. While a doctor can be found to be deliberately indifferent if he persists in a course of care that is not working, Dr. Byrd was not doing so when he advised Mr. Fox to continue taking his medication to determine its efficacy. Thus, in September of 2018, after Mr. Fox had taken Trileptal for two months, but had not experienced any relief, Dr. Byrd prescribed another medication strategy. These decisions were not "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Norfleet*, 439 F.3d at 396. No reasonable jury could find that Dr. Byrd was deliberately indifferent in these circumstances. Dr. Byrd is therefore entitled to summary judgment on Mr. Fox's claims.

      2. <u>Nurse Wright</u>

Nurse Wright also argues that she was not deliberately indifferent to Mr. Fox's pain.

Nurse Wright was contacted regarding a grievance submitted by Mr. Fox in August 2018. In responding to the grievance, Nurse Wright reviewed Mr. Fox's medical records, which indicated that Mr. Fox refused or missed doses on the morning of August 6, 2018, and the morning of August 11, 2018. Accordingly, Mr. Fox was reminded to be compliant so that the efficacy of his medications could be accurately assessed.

Next, Mr. Wellington emailed Nurse Wright on September 18, 2018, regrading Mr. Fox's grievance. Nurse Wright responded the same day and scheduled Mr. Byrd to be seen by Dr. Byrd the following day. Like Dr. Byrd's actions, Nurse Wright's actions demonstrate that she considered

his conditions and the treatment he was receiving when she reviewed his grievances. No reasonable jury could find that she was deliberately indifferent to his serious medical needs and she is entitled to summary judgment.

### B. *State Defendants*

In support of their motion for summary judgment, Warden Brown argues that he was not personally involved in any alleged denial of care, and Mr. Wellington and Mr. Gilmore argue that they relied on medical professionals and were not otherwise deliberately indifferent.

#### 1. Warden Brown

Warden Brown argues that he is entitled to summary judgment because he was not personally involved in any deprivation of Mr. Fox's constitutional rights.

"Individual liability under § 1983… requires personal involvement in the alleged constitutional deprivation." *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017) (internal quotation omitted) (citing *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983) ("Section 1983 creates a cause of action based on personal liability and predicated upon fault. An individual cannot be held liable in a § 1983 action unless he caused or participated in an alleged constitutional deprivation.... A causal connection, or an affirmative link, between the misconduct complained of and the official sued is necessary.")). Whether supervisory personnel at a prison are sufficiently involved in an alleged constitutional violation such that they may be liable for damages often depends on that person's knowledge of, and responsibilities regarding, the alleged harm. Mere "knowledge of a subordinate's misconduct is not enough for liability." *Vance v. Rumsfeld*, 701 F.3d 193, 203 (7th Cir. 2012) (en banc). Indeed, "inaction following receipt of a complaint about someone else's conduct is [insufficient]." *Estate of Miller by Chassie v. Marberry*, 847 F. 3d 425, 428 (7th Cir. 2017); *see Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("[The plaintiff's]

view that everyone who knows about a prisoner's problem must pay damages implies that he could write letters to the Governor . . . and 999 other public officials, demand that every one of those 1,000 officials drop everything he or she is doing in order to investigate a single prisoner's claims, and then collect damages from all 1,000 recipients if the letter-writing campaign does not lead to better medical care. That can't be right.").

Here is it undisputed that Warden Brown had a designee to respond to inmate grievances. Dkt. 60-4 ¶ 5. When the designee responded to the complaint, the designee is not required to discuss the complaint with Warden Brown. *Id.* There is no evidence that Warden Brown was aware of the letter or directed his designee Mr. Gilmore how to respond to it. There is therefore no evidence that Warden Brown had any alleged involvement in Mr. Fox's treatment and Warden Brown is entitled to summary judgment.

### 2. Mr. Wellington and Mr. Gilmore

Mr. Wellington and Mr. Gilmore also seek summary judgment on Mr. Fox's claims arguing that they relied on the opinion of medical professionals when responding to Mr. Fox's grievances.

> [I]f a prisoner is under the care of medical experts… a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)); *see also Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (grievance counselor responded reasonably by investigating the situation, making sure medical staff was monitoring and addressing the problem, and reasonably deferring to medical professional's opinions); *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005). However, nonmedical officials

"cannot simply ignore an inmate's plight" and can be found to be deliberately indifferent if they have reason to believe that prison doctors are mistreating or not treating a prisoner. *Arnett*, 658 F.3d at 755 (citing *Hayes v. Snyder*, 546 F.3d 516, 525 (7th Cir. 2008) and *Greeno*, 414 F.3d at 656). But "mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient." *Id.* (citing *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)). "The plaintiff must demonstrate that the communication, in its content and manner of transmission, gave the prison official sufficient notice to alert him or her to an excessive risk to inmate health or safety." *Id.* (internal quotations omitted).

### a. Mr. Wellington

Mr. Wellington addressed the following of Mr. Fox's grievances during the relevant time. First, Mr. Fox filed an RFHC and a grievance on February 6, 2018, when his Neurontin prescription ran out. 66-7, p. 2; Filing No. 60-3, p. 11. Mr. Wellington rejected the grievance because there was no indication that Mr. Fox had tried to resolve the complaint informally and because it seemed to be submitted on behalf on another person or group. *Id.*, p. 10. As a result of his RFHC, Mr. Fox saw Dr. West-Denning on February 12, 2018. Dkt. 66-4, p. 6 (West-Denning Aff. ¶ 9). On March 8, 2018, Mr. Fox filed a formal grievance relating to his prescribed pain medication and the "need to be seen on this matter [] immediately." Dkt. 60-3, p. 5. Mr. Wellington referred the matter to Health Services Administrator ("HSA") Hobson for a formal statement on March 12, 2018, who stated that Mr. Fox had been non-compliant with recommended exercises and that he should submit an RFHC to be seen in nursing sick call for his pain. *Id.*, p. 12-14. Mr. Wellington next addressed grievances submitted by Mr. Fox in August of 2018. The first grievance submitted in August 2018 was returned because the grievance form was not completely filled out. *Id.*, p. 51. When Mr. Fox corrected that error and resubmitted the grievance,

Mr. Wellington returned it because he believed that the complaint or concern was addressed previously in Grievance # 101220. *Id*., p. 54.

In other words, every time Mr. Fox filed a grievance, Mr. Wellington considered it and addressed it. Mr. Wellington rejected the February 6, 2018, grievance because Mr. Fox had not first attempted to resolve his complaint informally. Requiring Mr. Fox to address his complaint informally with his treatment providers is consistent with the latitude a grievance official has to rely on medical professionals. In fact, Mr. Fox filed an RFHC on the same day as this grievance and was seen shortly thereafter. The next time Mr. Fox filed a formal grievance, Mr. Wellington referred the matter to the HSA who responded with the explanation that Mr. Fox needed to comply with his exercise plan and file an RFHC. Again, Mr. Wellington properly relied on a medical professional in investigating this grievance. Finally, Mr. Wellington rejected Mr. Fox's last grievance finding that his issue had already been addressed. While Ms. Littlejohn later disagreed with this response, she advised Mr. Fox to submit an RFHC so that he could be treated by medical professionals. Mr. Wellington's response was at most negligent and does not demonstrate deliberate indifference. Mr. Wellington is therefore entitled to summary judgment.

### b. Mr. Gilmore

Mr. Gilmore responded to a letter that Mr. Fox wrote to Warden Brown on March 20, 2018. In that letter, Mr. Fox stated that his Neurontin prescription had expired and that Dr. West-Denning had failed to evaluate his pain. Dkt. 60-7. Mr. Gilmore responded that Mr. Fox had terminated the visit with Dr. West-Denning, that he was prescribed Naproxen, that his Neurontin would not be renewed, and that he could submit an RFHC if he wished to see the doctor before his next chronic care appointment. *Id.* Mr. Gilmore's response indicates that he investigated Mr. Fox's complaints and concluded that he was receiving adequate treatment. Mr. Gilmore could not make

medical decisions for Mr. Fox or instruct medical personnel on how to treat him. No reasonable jury could find Mr. Gilmore deliberately indifferent in these circumstances and Mr. Gilmore is entitled to summary judgment.

### IV. Conclusion

For the foregoing reasons, the defendants are entitled to summary judgment on Mr. Fox's claims. Accordingly, the State Defendants' motion for summary judgment, dkt. [60], and the Medical Defendants' motion for summary judgment, dkt. [62], are **granted**. Judgment consistent with this Order shall now issue.

**IT IS SO ORDERED.**

Date: 10/8/2020

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

RICHARD A. FOX
883999
WABASH VALLEY - CF
WABASH VALLEY CORRECTIONAL FACILITY - Inmate Mail/Parcels
Electronic Service Participant – Court Only

All Electronically Registered Counsel